J-S24032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.M., FATHER | : | |
| | : | No. 647 EDA 2022 |

Appeal from the Order Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000316-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: N.D.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.M., FATHER | : | |
| | : | No. 648 EDA 2022 |

Appeal from the Decree Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000621-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: S.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.M., FATHER | : | |
| | : | No. 649 EDA 2022 |

Appeal from the Order Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000317-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: S.N.M.-V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

|  | : |  |
|---|---|---|
| APPEAL OF: L.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 650 EDA 2022 |

Appeal from the Decree Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000622-2021

| IN THE INTEREST OF: L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 651 EDA 2022 |

Appeal from the Order Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000318-2020

| IN THE INTEREST OF: L.H.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 652 EDA 2022 |

Appeal from the Decree Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000620-2021

BEFORE:  PANELLA, P.J., LAZARUS, J., and PELLEGRINI, J.*

---

* Retired Senior Judge assigned to the Superior Court.

- 2 -

J-S24032-22

MEMORANDUM BY PELLEGRINI, J.:           **FILED AUGUST 30, 2022**

L.M. (Father) appeals from the orders and decrees[1] entered in the Court of Common Pleas of Philadelphia County (trial court) granting the petitions filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate his parental rights to N.V. a/k/a N.D.V. (age six; d.o.b. May 2015), L.M. a/k/a L.H.M. (age four; d.o.b. December 2016) and S.V. a/k/a S.N.M.-V. (age two; d.o.b. February 2019) (collectively, Children) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8) and (b), and changing their permanency goals to adoption.[2] He argues that DHS did not prove its case by clear and convincing evidence where he proved that he made significant progress toward reunification and that he has a parental bond with Children despite his periods of incarceration. We affirm.

We take the following factual background and procedural history from the trial court's April 26, 2022 opinion and our independent review of the record.

---

[1] We consolidated the cases *sua sponte* on March 23, 2022.

[2] The February 15, 2022 orders and decrees also involuntarily terminated the parental rights of N.G.-V (Mother) to the Children. She has appealed the orders and decrees at docket numbers 641-646 EDA 2022 and is not the subject of this appeal. She will only be mentioned to the extent necessary to provide a full picture of the pertinent events.

- 3 -

**I.**

**A.**

DHS became involved with this family in February 2019 when it received a General Protective Services (GPS) report on February 7, 2019, alleging that S.V. and Mother tested positive for marijuana when S.V. was born prematurely at 33 weeks' gestation on February 6, 2019, and Mother admitted she used marijuana during the pregnancy to self-medicate. DHS did not file dependency petitions at the time because it determined the Children were safe in the home. (**See** Petition for Goal Change to Adoption, 10/22/21, Exhibit A, at ¶ c); (Dependency Petitions, 2/27/20, at ¶¶ 5(b), (d)); (N.T. TPR Hearing (N.T.), 2/15/22, at 7, 32-33).

DHS received a GPS report on March 11, 2019, that one-month old S.V. was treated at St. Christopher's Hospital because Father, who lived with Mother and Children in the family home, flipped a mattress off a bed on which Mother and S.V. were sitting because he was angry,[3] resulting in them falling on the floor and a mark to S.V.'s head. Mother told DHS that she and Father had a three-year history of domestic violence from which she had sustained broken bones and bruises and that he also abused N.V. and L.M. She told DHS that Father would get angry when she would not buy him marijuana. An

---

[3] Father has a history of drug abuse (marijuana). (**See** Petition for Goal Change, at ¶ rr).

examination at St. Christopher's Hospital revealed that N.V. had multiple linear scars to his back, chest and legs that appeared to be old. (*See* Petition for Goal Change, Exhibit A, at ¶ h); (N.T., at 32).

On March 12, 2019, Father was arrested and charged with aggravated assault, endangering the welfare of children (EWOC) wherein a parent commits the offense, simple assault and recklessly endangering another person (REAP) as a result of the March 11, 2019 incident. On May 2, 2019, the Commonwealth withdrew the charges because Mother failed to appear at several of Father's criminal hearings. (*See* Petition for Goal Change, Exhibit A, at ¶ g).

On March 25, 2019, Community Umbrella Agency (CUA) Northeast Treatment Center (NET) began providing the family with services. Ms. Ahmani Quarles, the assigned CUA caseworker, also observed the marks on N.V. Ms. Quarles believed the abuse had occurred and that N.V. was afraid of Father because of it. (*See* N.T., at 33).

Mother and Children moved out of the family home on approximately March 13, 2019, and moved back on June 9, 2019. When CUA met with the parents and Children, it determined that Children were safe at that time. (*See id.* at ¶ q). In July 2019, Mother left Children with maternal grandmother (MGM) to attend a month-long Pittsburgh job training program. She and Children returned to the family home in October 2019. At that time, Mother admitted she recently missed S.V.'s cardiology appointment, and on October

10, 2019, she overslept and missed the rescheduled appointment. (*See id.* at ¶¶ r-u). When Ms. Quarles spoke to Father about ensuring S.V. attends her appointments, he indicated it was Mother's responsibility to handle them. (*See id.* at ¶ u); (N.T., at 34-35).

On October 18, 2019, Father was arrested and charged with simple assault, harassment and criminal mischief-damage to property in Montgomery County to which he pleaded guilty. (*See* Dependency Petitions, 2/27/20, at ¶ 5(t)); (Petition for Goal Change, Exhibit A, at ¶ v); (N.T., at 23). In December 2019, Father was the protagonist in a domestic violence incident at the family home in which he again flipped a mattress with Mother and S.V. on it when Mother refused to tell him who she was speaking with on the phone. This incident involved a knife, as reported by both Mother and N.V. Mother left the home with Children and went to live with her aunt and uncle at MGM's home. (*See* N.T., at 7-8); (Petition for Goal Change, Exhibit A, at ¶ w).

### B.

On February 27, 2020, DHS filed urgent dependency petitions as to all Children. At the March 11, 2020 adjudicatory hearing, the trial court adjudicated them dependent and directed DHS to supervise their care. The court ordered that Children remain with Mother, with supervised visits by Father. The court referred Father to the Clinical Evaluation Unit (CEU) for drug and alcohol screens, dual diagnosis assessments and three random drug screens prior to the next court date. He was also referred to the Achieving

Reunification Center (ARC) for parenting, housing and domestic violence counseling, and to Behavioral Health Services (BHS) for a consultation/evaluation. CUA was ordered to obtain an order of protective custody if Mother left MGM's home with Children. (**See** Petition for Goal Change, Exhibit A, at ¶ aa); (Order of Adjudication and Disposition, 3/11/20).

On May 21, 2020, DHS filed an application for emergency protective custody for Children because it learned that Mother had left MGM's home and, upon returning, said she was taking Children to an undisclosed address in New Jersey. On May 22, 2020, the court held a shelter care hearing at which it lifted the temporary order of protective custody and fully committed Children to DHS. Children were placed in separate foster homes through Bethany Children's Services. Father was ordered to attend weekly visitation, which was virtual at the time because of the Covid-19 pandemic. (**See** Recommendation for Shelter Care/Order, 5/22/20); (Petition for Goal Change, Exhibit A, at ¶¶ ii, jj).

### C.

Permanency review hearings were regularly held at which DHS was found to have made reasonable efforts to finalize the permanency plan.

At the October 15, 2020 hearing, Father's visitation remained supervised at the agency. The court referred him to CEU for a dual diagnosis assessment, full drug and alcohol screen and three random screens before the next court date. Father also was referred to ARC for parenting, housing and

domestic violence classes. CUA was ordered to set appropriate objectives for Father. (**See** Permanency Review Order, 10/15/20).

At the April 15, 2021 hearing, the court noted that Father was incarcerated and ordered that, upon his release, visitation would be supervised at the agency. The court again referred Father to ARC for appropriate services and domestic violence classes. Upon release, Father was ordered to go to CEU for assessment, screening and monitoring. (**See** Recommendation—Permanency Review/Order, 4/15/21).

A revised SCP was created on June 17, 2021. Father's objectives for reunification were:

1. Make himself available for services upon release from prison;

2. Attend ARC for parenting classes per court order once released from prison;

3. Have supervised visitation with Children per court order once released from prison;

4. Attend Menergy or other creditable domestic classes;

5. Refrain from any form of physical discipline;

6. Have a CEU evaluation for dual diagnosis assessment;

7. Follow and remain in compliance with the recommendations of a dual diagnosis evaluation; and

8. Make weekly contact with CUA.

(**See** Petition for Goal Change, Exhibit A, at ¶ mm).

At the August 12, 2021 permanency review hearing, Father remained incarcerated. Visitation was ordered to be supervised and virtual in

accordance with the Detention Center/Philadelphia County Prison Center policies. Upon release, Father was to be referred to ARC for parenting, housing and employment services and was referred to Menergy for domestic violence classes. He was to be referred to CEU for assessment and screening upon release from prison. (**See** Recommendation—Permanency Review/Order, 8/12/21).

**D.**

On October 22, 2021, DHS filed separate petitions to terminate the parental rights (TPR) of Father and Mother and change Children's goals to adoption because Father and Mother had failed to achieve any SCP objectives, which had been explained to them on more than one occasion by both DHS and the trial court. The court held a hearing on February 15, 2022. Ms. Quarles testified as the representative of CUA. Father testified on his own behalf.

**1.**

In addition to the foregoing facts, Ms. Quarles testified that at the time of the hearing, N.V. was six years old, L.M. was five years old and S.V. was three years old. She explained that S.V. had a heart murmur, and that Mother had either forgotten or missed several cardiology appointments while she was in her care. When Ms. Quarles spoke to Father about the missed appointments and told him they were his responsibility as well, Father suggested that it was Mother's responsibility to handle them. (**See** N.T., at 34).

She testified that Father was ordered to go to CEU for a urinalysis after the last permanency hearing. When Ms. Quarles attempted to take him for the test, he was on the telephone and said he would meet her there, but never appeared. (*See id.* at 20). He has failed to provide any random drug screens despite her calling him approximately five times and giving him 24 hours-notice of the screens as he requested. (*See id.* at 41-42). He did not give Ms. Quarles any explanation for his failure to report. (*See id.* at 21). He finally attended the dual diagnosis by phone in January 2022, months after the TPR petitions were filed, and drug treatment was not recommended. (*See id.* at 20). Father has not attended any domestic violence classes at Menergy. (*See id.* at 21). He has not given Ms. Quarles any explanation for his failure to comply with these objectives. While he did complete the housing and parenting treatment at ARC, he did not do so until February 11, 2022, months after the TPR petitions were filed and days before the hearing. (*See id.* at 21).

Ms. Quarles stated that she understood that Father was living with his mother and sister, but she had not visited the home. (*See* N.T., at 21-22). It was her opinion the home was not appropriate for reunification. (*See id.* at 44). Although Father told Ms. Quarles that he was employed at the airport, he did not provide her with any documentation. (*See id.* at 22).

Other than when Father was incarcerated from January 2021 to August 2021, his visits with Children were supervised at the agency, even when they

were living with Mother. (*See id.* at 22-23). He attended 11 out of the 26 visits offered between when he started visiting them on October 15, 2021, (after his August 2021 prison release) and the February 15, 2022 hearing. (*See id.* at 45). Specifically, he failed to attend any visits in 2020 without explanation, attended seven times in 2021 and four times in 2022. (*See id.* at 22-23, 45).

Father was visiting L.M. and S.V. in person at the time of the hearing. (*See id.* at 24-25). Ms. Quarles did not observe a parent-child bond, despite him interacting with them during the visits by boxing and play fighting with L.M. (*See id.* at 24-25). Neither child identifies him as their father. L.M. and S.V. either call him by his first name or ask him for it, with L.M. asking Father for his name during every visit since October 2021. (*See id.* at 24-25). After visits with Father started, L.M. began hitting his teachers and talking back to them, which he has never done before. (*See id.* at 38). S.V.'s behavior at school also deteriorated, with her not following teachers' directions and fighting with other children. (*See id.* at 38-39). Despite being fully potty-trained, she began urinating on herself. (*See id.* at 39).

N.V.'s visits with Father were virtual because he refused to attend in-person. (*See id.* at 25-26, 37-38). During the two virtual visits they had, N.V. "shut down" and would not talk at all. (*Id.* at 25-26). During the second visit, Father asked N.V. where he lived so that he could visit him and N.V. got scared, so the visit had to end early. (*See id.* at 26). Ms. Quarles testified

that since the virtual visits commenced, N.V. had been urinating and defecating on himself, locking himself in the bathroom and having behavioral issues at school. (*See id.* at 27, 38). Ms. Quarles believed that marks on N.V.'s body, which Mother reported were caused by Father, were part of the cause of N.V.'s fear. (*See id.* at 33).

Father only contacted Ms. Quarles two times while he was incarcerated. (*See id.* at 35). Ms. Quarles discussed Father's objectives with him during both phone calls and told him that they could be completed while he was in prison, but he failed to do so. (*See id.* at 36-37). Father never contacted her at any other time to ask about Children, write to them or send them cards. (*See id.* at 35).

Ms. Quarles testified that Children were put in general foster care in three different pre-adoptive homes. (*See id.* at 8-9, 29). Children rely on their foster parents to meet their needs, are thriving and happy, share a parent/child bond with them and refer to them as "mom" and "dad." Ms. Quarles opined that she did not believe that Children have a parent/child relationship or bond with Father and that they would not suffer irreparable harm if his parental rights were terminated. To the contrary, she believed that continuing the relationship with Father was detrimental to them. She stated that it would be in their best interests to terminate his parental rights so they were eligible for adoption. (*See id.* at 30, 37-41, 56).

The trial court found that Ms. Quarles was "credible and accorded great weight" to her testimony. (Trial Court Opinion, 4/26/22, at 14).

**2.**

Father testified that he had completed parenting and housing classes at ARC. (*See* N.T., at 58). He said he remembered being called about the random drug screens two or three times, but he was unable to go because he was busy. (*See id.* at 58-59). Father was aware he needed to do this to be reunified with Children. (*See id.* at 73). Although he said he was told he had been referred to Menergy for domestic violence treatment, he did not go because no one answered when he called the program. (*See id.* at 59-60).

Father said he lives in an apartment, but he is not certain of it is appropriate for Children because it is small. (*See id.* at 60). However, he later admitted that he was renting two rooms in a rooming house. (*See id.* 72). A third room is occupied by a roommate whom he does not know personally. (*See id.* at 60-61). He confirmed that he recently obtained employment at the airport and that he could provide CUA with documentation. (*See id.* at 61).

Father admitted that "they've been saying" that N.V. was afraid of him, but he denied abusing him, only hitting him "discipline-wise but not as abusing-wise … like probably a little pop or something." (*Id.* at 72). He said he told N.V. at the visits that he missed him and N.V. said he missed him as

well.  (*See id.* at 62).  Father described N.V. "looking around for confirmation, like someone was telling him [what] to say and do."  (*Id.* at 62).

Father admitted that he did not attend all visitation with L.M. and S.V. but said that two visits were missed when he did not confirm, and that the rest were cancelled by CUA.  (*See id.* at 63).  He claimed he did not complete any goals in prison because they never "reached him."  (*Id.* at 71).

The trial court did not find Father's testimony credible and found instead that it suggested that he did not feel the need to provide Children with parental support.  (Trial Ct. Op., at 14).

**3.**

At the conclusion of the hearing, the trial court entered an order finding clear and convincing evidence supported involuntarily terminating the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). Father timely appealed and filed a contemporaneous statements of errors.[4] *See* Pa.R.A.P. 1925(a)(2)(i).

_____

[4] We review the trial court's order for an abuse of discretion.  *See In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted).  Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings."  *In re Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017).  "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence."  *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."  *In re A.S.*, 11 A.3d 473, 477 (Pa. Super. 2010).  "If competent evidence supports the trial court's
*(Footnote Continued Next Page)*

- 14 -

## II.

## A.

The trial court terminated Father's parental rights pursuant to Section 2511(a)(1),(2), (5), (8) and (b) of the Adoption Act, which provide:

**(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

findings, we will affirm even if the record could also support the opposite result." ***Id.***

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

It is well-settled that "[w]e need only agree with [the trial court's] decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights." *Int. of K.M.W.*, 238 A.3d 465, 473 (Pa. Super. 2000) (citation omitted). For the following reasons, we conclude that the trial court correctly determined that DHS met its burden of proof under subsections 2511(a)(2) and (b).

**B.**

Father argues that the trial court erred in finding that DHS produced clear and convincing evidence to support the termination of his parental rights where testimony established that he made significant progress toward reunification. We first address the court's termination of Father's parental rights pursuant to Section 2511(a)(2). *See Int. of K.M.W.*, *supra* at 473.

- 16 -

In a termination proceeding, the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are "required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re J.R.E.*, 218 A.3d 920, 925 (Pa. Super. 2019) (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *See id.* (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted).

Where the parent is incarcerated:

the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's

- 17 -

responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his ... child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his ... children.

* * *

Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

*In re Z.P.*, 994 A.2d 1108, 1120 (citation omitted).

In the instant case, the trial court explains:

The Children were adjudicated dependent on March 11, 2020. The record and testimony presented at the February 15, 2022 Termination Hearing demonstrated … Father's ongoing inability to provide care for or control of the[] Children. [His] failure to remedy the conditions that brought the Children into care indicated a continuing disregard for [his] parental duties. Specifically, … Father was [] derelict in following his case plan objectives. Father refused to submit to urinalysis for drug testing and on at least one occasion failed to appear for the test immediately after a court hearing when he informed the case manager who tried to take him with her for the test that he would meet her as soon as he completed a phone call. Father failed to attend domestic violence classes despite being referred to a specific program. Father has not visited the Children on a regular basis due to his being incarcerated for a significant period of time. The trial court noted that all the Children were placed in foster care. The trial court prefers not to keep siblings separate but the testimony and evidence indicated that the Children and their respective caregivers shared a parental bond and their respective caregivers were providing for the Children's daily emotional and physical needs. In contrast, the [c]ourt found that … Father lacked the capacity to address the[] Children's basic emotional and physical needs. Consequently, documents and testimony presented at the termination hearing provided the trial court clear and convincing evidence to terminate … Father's parental rights and rule that the termination of these rights would be in the best

- 18 -

> interest of the Children pursuant to 23 Pa.C.S.[] §§ 2511(a)(1),
> (2), (5), (8) and 23 Pa.C.S.[] § 2522(b).

(Trial Ct. Op., at 11-12) (footnotes omitted); (**see id.** at 14-15).

Father argues that DHS did not meet its burden under Section 2511(a)(2) because he "was actively working on all of his goals" and has never "evidenced a settled purpose of relinquishing his parental rights" or "refused to perform his parental duties." (Father's Brief, at 19).

The record belies Father's argument where it reflects that DHS provided clear and convincing evidence to support termination of his parental rights. It is undisputed that DHS became involved with the family in February 2019 when S.V. was born with marijuana in her system and the Children have been in placement since May 2020 due, in large part, to the domestic violence in the home perpetrated by Father and his failure to comply with his SCP goals and the trial court's orders, resulting in his inability to remedy the situation.

Father was not incarcerated for the life of this case, and Ms. Quarles testified he failed to visit Children at all in 2020, despite not being incarcerated until January 2021. (**See** N.T., at 22-23, 41-42). Father provided Ms. Quarles with no reason for this failure. (**See id.** at 22-23, 41-42). While Father was incarcerated from January 2021 to August 2021, he only reached out to Ms. Quarles twice and did not send letters to Children or attempt to contact them in any way. (**See id.** at 35). After his August 2021 release, he did not resume visitation until October 2021, then attending only 11 of the 26 visits he was

provided. (*See id.* at 23, 45). As a result, S.V. and L.M. did not recognize him as their father or even know his name. (*See id.* at 24-25).

Ms. Quarles testified that during the two conversations she had with Father during his incarceration, she informed him that he could complete his goals while in prison, and, importantly, even though his domestic violence was one of the main precipitating causes of Children's removal, he failed to attend or even make contact with Menergy for domestic violence counseling before, during or after his period of incarceration. (*See id.* at 21, 43, 59). Father maintained that he reached out to Ms. Quarles "as much as he could" and denied knowing about his goals. (*See id.* at 71).

Father claims that he is now compliant with most of his goals other than "anger management" (presumably domestic violence treatment) because he was unable to reach Menergy. (*See* Father's Brief, at 19). We do not find this argument persuasive. Ms. Quarles credibly testified that she referred Father to Menergy and when she called to follow up with the provider, they advised her that they had no record of him contacting them. (*See* N.T., at 21, 43). Moreover, Father's argument ignores that his domestic violence perpetrated against Children and Mother and his related inability to parent were major precipitating events for Children's removal and he has utterly failed to establish that this incapacity has been remedied.

Further, Father failed to do anything toward meeting any drug and alcohol-related objectives, despite being aware that screens were a

reunification objective for approximately two years from when the Children were put in placement until attending a dual diagnosis assessment in January 2022 by phone. (*See id.* at 20, 42-43, 73). Although he finally completed ARC sessions for parenting and housing, he failed to do so until February 11, 2022. (*See id.* at 21). When Ms. Quarles asked him about S.V. missing her cardiology appointments, he suggested this was Mother's responsibility, not his. (*See id.* at 34). Ms. Quarles stated that Father's living situation is not a housing resource. He now claims that he has appropriate housing, but this somewhat contradicts his testimony in which he stated that he rents two rooms in a rooming house, and he was not certain it was appropriate for reunification because the rooms were small and another individual lived in a third room. (*See* Father's Brief, at 19); (N.T., at 21-22, 44, 60-61, 72); (Trial Ct. Op., at 14).

Based on the foregoing, DHS provided clear and convincing evidence that due to Father's continued incapacity, he is unable to provide Children with the essential care necessary for their physical and mental well-being. The trial court did not abuse its discretion in finding that DHS presented sufficiently clear and convincing evidence to support termination based on Section 2511(a)(2).

**C.**

Having determined that the court properly found that termination of Father's parental rights was appropriate under subsection 2511(a)(2), we now

consider whether termination is in Children's best interests pursuant to subsection 2511(b).

> With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.
>
> One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond. The fact that a child has a bond with a parent does not preclude the termination of parental rights. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.
>
> It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*Int. of K.M.W.*, *supra* at 475 (case citations and most quotation marks omitted).

Father argues that "[t]ermination of [his] parental rights would have a detrimental effect on the Children and does not serve [their] physical and

emotional needs and welfare" where he has consistently visited them since "August 2021."[5] (Father's Brief, at 23).

Ms. Quarles testified that N.V. refuses to see Father in person because he is afraid of him due to the abuse he has suffered at his hand, and he even shuts down out of fear in the virtual visits. (*See id.* at 25-27, 33, 37-38). All three Children have experienced significant behavioral issues at school and/or at home since visits with Father began in October 2021. (*See id.* at 38-39). Because of his inconsistent visits with L.V. and S.V., they do not recognize him as their father and cannot remember his name. (*See id.* at 24-25). She does not believe that Children share a parent/child relationship or bond with Father. (*See id.* at 30).

Conversely, she testified Children refer to their foster parents as "mom" and "dad" and consider the parents' family to be their own. (*See id.* at 18-19, 39-40). N.V. has expressed a wish to be adopted by the foster parents. (*See id.* at 56). The foster parents take Children to their appointments and provide for their needs and welfare. (*See id.* at 29). Ms. Quarles testified that Children are happy and healthy and have parent/child bonds with their foster parents. All the foster parents are adoptive resources. (*See* N.T., at

---

[5] As noted above, Ms. Quarles credibly testified that Father did not visit the Children at all in 2020 before his January 2021 incarceration, and that although he was released from prison in August 2021, he did not visit with them until October 2021, and then attended less than half of the visit opportunities provided. (*See* N.T., at 22- 23, 41-42, 45-46).

29). She expressed that termination of Father's parental rights would not cause irreparable harm to Children and that, to the contrary, **not** doing so would be detrimental to them. (***See id.*** at 30, 39). Thus, she opined it was in their best interests to terminate Father's parental rights and change their goals to adoption. (***See id.*** at 30-31, 40-41).

Hence, the record supports the trial court's finding that the evidence and DHS testimony established that the termination of Father's parental rights would best serve Children's interests pursuant to Section 2511(b) and we find no abuse of discretion in its decision to terminate Father's parental rights to Children and change their goals to adoption.

Orders and decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/30/2022